No. 21–10199–F

---

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

**JUAN ENRIQUE PINTO,**

Objector-Appellant,

**v.**

**SUSAN DRAZEN, ET AL.**

Plaintiffs-Appellees,

**v.**

**GODADDY.COM, LLC,**

Defendant-Appellee.

---

On Appeal from the United States District Court
For the Southern District of Alabama
(Case No. 1:19–00563–KD–B)

---

## *EN BANC* BRIEF OF DEFENDANT-APPELLEE GODADDY.COM, LLC

---

Matthew B. Criscuolo
COZEN O'CONNOR
One North Clematis Street, Suite 510
West Palm Beach, FL 33401
Tel: 561-515-5263
Email: mcriscuolo@cozen.com
*Attorneys for Defendant-Appellee*
*GODADDY.COM, LLC*

Jeffrey M. Monhait
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: 215-665-2084
Email: jmonhait@cozen.com
*Attorneys for Defendant-Appellee*
*GODADDY.COM, LLC*

**Certificate of Interested Persons and
Corporate Disclosure Statement**

Defendant-Appellee GoDaddy.com, LLC, by and through undersigned counsel and pursuant to Local Rule 26.1–1, submits its Certificate of Interested Persons and Corporate Disclosure Statement as follows:

GoDaddy.com, LLC is a wholly-owned subsidiary of Go Daddy Operating Company, LLC;

Go Daddy Operating Company, LLC is a wholly-owned subsidiary of Desert Newco, LLC; and

Desert Newco, LLC's sole managing member is GoDaddy Inc., which is a publicly traded company on the New York Stock Exchange (GDDY).

## <u>Interested Persons</u>

Bandas Law Firm, PC (Counsel for Objector-Appellant Juan Enrique Pinto);

Bandas, Christopher A. (Counsel for Objector-Appellant Juan Enrique Pinto);

Bennett, Jason (Plaintiff-Appellee);

Bock Hatch Lewis & Oppenheim, LLC (Counsel for Plaintiffs-Appellees);

Bock, Phillip A. (Counsel for Plaintiffs-Appellees);

Clore, Robert William (Counsel for Objector-Appellant Juan Enrique Pinto);

Cox, John R. (Counsel for Plaintiffs-Appellees);

Cozen O'Connor (Counsel for Defendant-Appellee GoDaddy.com, LLC);

Criscuolo, Matthew B. (Counsel for Defendant-Appellee GoDaddy.com, LLC);

Deen, T. Jefferson, III (Counsel for Objector-Appellant Juan Enrique Pinto);

Desert Newco, LLC;

Drazen, Susan (Plaintiff-Appellee);

Kenneth J. Riemer Attorney at Law (Counsel for Plaintiffs-Appellees);

Kent Law Offices (Counsel for Plaintiffs-Appellees);

Kent, Trinette G. (Counsel for Plaintiffs-Appellees);

Go Daddy Operating Company, LLC;

GoDaddy Inc.;

GoDaddy.com, LLC (Defendant-Appellee);

Hatch, Robert M. (Counsel for Plaintiffs-Appellees);

Helfand, Steven F.;

Herrick, John;

Law Office of John R. Cox (Counsel for Plaintiffs-Appellees);

Mark K. Wasvary, P.C. (Counsel for Plaintiffs-Appellees);

Meyers, Evan (Counsel for Plaintiffs-Appellees);

McGuire Law, PC (Counsel for Plaintiffs-Appellees);

McMorrow Law, PC (Counsel for Plaintiffs-Appellees);

McMorrow, Michael J. (Counsel for Plaintiffs-Appellees);

Monhait, Jeffrey M. (Counsel for Defendant-Appellee GoDaddy.com, LLC);

Pinto, Juan Enrique (Objector-Appellant);

Reimer, Kenneth J. (Counsel for Plaintiffs-Appellees);

The Honorable Sonja F. Bivins (U.S. District Magistrate Judge, So. District of Alabama);

The Honorable Kristi K. DuBose (U.S. District Court Judge, So. District of Alabama);

Turin, Yevgeniy Y. (Counsel for Plaintiffs-Appellees);

Underwood & Riemer, PC (Counsel for Plaintiffs-Appellees);

Underwood, Earl Price, Jr. (Counsel for Plaintiffs-Appellees);

Wasvary, Mark K. (Counsel for Plaintiffs-Appellees); and

I hereby certify that, except as disclosed above, I am unaware of any actual or potential conflict of interest involving the justices of the Eleventh Circuit Court of Appeals assigned to this case, and will immediately notify the Court in writing upon learn of any such conflict.

## Statement Regarding Oral Argument

Pursuant to the Clerk of Court's May 9, 2023 Memorandum to Counsel or Parties, this case is listed for oral argument before the Court sitting *en banc* on Tuesday, June 13, 2023.

# TABLE OF CONTENTS

**Page**

**Certificate of Interested Persons and Corporate Disclosure Statement.... CIP-1**

**Statement Regarding Oral Argument**....................................................................i

**Table of Contents** ............................................................................................ ii

**Table of Authorities** ......................................................................................iv

**Jurisdictional Statement**................................................................................ix

**Statement of Issues**.........................................................................................1

**Statement of the Case** ....................................................................................2

    A.    The Underlying Litigation................................................................2

    B.    The Settlement.................................................................................3

    C.    The District Court's Examination Of Standing And Preliminary Approval Of The Settlement .................................................................4

    D.    The Fee Award And Objector-Appellant's Objection ...........................6

    E.    The District Court's Final Approval Of The Settlement.......................7

    F.    Objector-Appellant's Appeal Of The Final Approval Order ................7

**Summary of the Argument** .........................................................................**10**

**Argument** ....................................................................................................**13**

    A.    Legal Standard..............................................................................13

    B.    One Text Message Is Not A Concrete Injury .....................................14

        1.    One Text Is Not Analogous To Intrusion Upon Seclusion.......17

            a.    One Text Is Not Persistent Conduct That Amounts To Hounding, The Harm That An Intrusion Upon Seclusion Claim Targets................................................................17

            b.    The Decisions That Are Part Of The Purported Circuit Split Are Inapposite Or Include Errors In The Required Historical Analysis .......................................................20

        2.     One Text Is Not Analogous To Public Nuisance.......................28

        3.     One Text Is Not Analogous To Other Common-Law Torts.....31

        4.     Congressional History Does Not Support Overturning *Salcedo* .................................................................................33

   C.    *Salcedo* Is Established Law In This Circuit .......................................38

**Conclusion.................................................................................................41**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Calkins v. Ponca City*,
214 P. 188 (Okla. 1923).................................................................................29

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
467 U.S. 837 (1984).......................................................................................35

*Cordoba v. DIRECTV, LLC*,
942 F.3d 1259 (11th Cir. 2019) ...............................................................*passim*

*Cranor v. 5 Star Nutrition, L.L.C.*,
998 F.3d 686 (5th Cir. 2021) ........................................................................30

*Dean v. State*,
106 S.E. 792 (Ga. 1921) ...............................................................................29

*Drazen v. GoDaddy.com, LLC*,
Case No. 19–cv–00563 (S.D. Ala. filed Aug. 21, 2019)....................................ix

*Drazen v. Pinto*,
41 F.4th 1354 (11th Cir. 2022), *reh'g en banc granted and opinion
vacated*, 61 F.4th 1297 (11th Cir. 2023).....................................................*passim*

*Drazen v. Pinto*,
61 F.4th 1297 (11th Cir. 2023) ..................................................................ix, 9

*Fenwick v. Orthopedic Specialty Inst., PLLC*,
No. 19–CV–62290, 2020 WL 913321 (S.D. Fla. Feb. 4, 2020)........................39

*Finkelsetin v. City of Sapulpa*,
234 P. 187 (Okla. 1925)................................................................................29

*Florence Endocrine Clinic, PLLC v. Arriva Med., LLC*,
858 F.3d 1362 (11th Cir. 2017) ....................................................................41

*Fontanez v. Wolverine World Wide, Inc.*,
No. 22–cv–2538, 2022 WL 17959844 (M.D. Fla. Dec. 27, 2022).....................39

*Gadelhak v. AT&T Services, Inc.*,
950 F.3d 458 (7th Cir. 2020) ......................................................................*passim*

*Glasser v. Hilton Grand Vacations Co.*,
948 F.3d 1301 (11th Cir. 2020) ........................................................................40

*Grigorian v. FCA US LLC*,
838 F. App'x 390 (11th Cir. 2020) ........................................................21, 39, 41

*Gunn v. Thrasher, Buschmann & Voelkel, P.C.*,
982 F.3d 1069 (7th Cir. 2020) ..........................................................................26

*Herrick v. GoDaddy.com, LLC*,
312 F. Supp. 3d 792 (D. Ariz. 2018) ...................................................................3

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) ...........................................................................................13

*Hunstein v. Preferred Collection & Mgmt. Servs.*,
48 F.4th 1236 (11th Cir. 2022) (en banc) ...................................................*passim*

*Kimble v. Marvel Ent., LLC*,
576 U.S. 446 (2015) ...........................................................................................38

*Leyse v. Bank of Am. Nat'l Ass'n*,
856 F. App'x 408 (3d Cir. 2021) ........................................................................22

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ...............................................................................13, 34, 36

*Lupia v. Medicredit, Inc.*,
8 F.4th 1184 (10th Cir. 2021) ............................................................................21

*McGinley v. Houston*,
361 F.3d 1328 (11th Cir. 2004) ........................................................................38

*Melito v. Experian Mktg. Sols., Inc.*,
923 F.3d 85 (2d Cir. 2019) ..........................................................................22, 23

*Moragne v. States Marine Lines, Inc.*,
398 U.S. 375 (1970) ...........................................................................................38

*Muccio v. Global Motivation, Inc.*,
No. 22–81004–CIV, 2022 WL 17969922 (S.D. Fla. Dec. 27, 2022), *appeal docketed*, No. 23–10081 (9th Cir. Jan. 9, 2023)..........................39

*Muransky v. Godiva Chocolatier, Inc.*,
979 F.3d 917 (11th Cir. 2020) (en banc) ....................................................*passim*

*Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*,
781 F.3d 1245 (11th Cir. 2015) ...........................................................41

*Payne v. Tennessee*,
501 U.S. 808 (1991)...........................................................................38

*Salcedo v. Hanna*,
936 F.3d 1162 (11th Cir. 2019) ...................................................*passim*

*Smith v. Sedalia*,
53 S.W. 907 (Mo. 1899) ...........................................................................28

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)...........................................................................*passim*

*Susinno v. Work Out World Inc.*,
862 F.3d 346 (3d Cir. 2017) ...........................................18, 21, 22, 23

*Thornley v. Clearview AI, Inc.*,
984 F.3d 1241 (7th Cir. 2021) .......................................................26

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021)...........................................................................*passim*

*United States v. Amodeo*,
916 F.3d 967 (11th Cir. 2019) .......................................................13

*Van Patten v. Vertical Fitness Grp., LLC*,
847 F.3d 1037 (9th Cir. 2017) .................................................22, 23

*Wakefield v. ViSalus, Inc.*,
51 F.4th 1109 (9th Cir. 2022) .......................................................23

*Ward v. NPAS, Inc.*,
63 F.4th 576 (6th Cir. 2023) .................................................21, 26

*State ex rel. Wear v. Springfield Gas & Elec. Co.*,
  204 S.W. 942 (Mo. Ct. App. 1918) ....................................................................29

*Weitz v. Genting New World LLC*,
  No. 22–cv–23209, 2023 WL 2328365 (S.D. Fla. Mar. 2, 2023).......................39

**Statutes**

28 U.S.C. § 1291 ....................................................................................................ix

28 U.S.C. § 1331 ....................................................................................................ix

47 U.S.C. § 227 ...............................................................................................ix, 36

Consolidated Appropriations Act, 2018, Pub. L. No. 115–141, 132
  Stat. 348 (2018)..............................................................................................36

Telephone Consumer Protection Act of 1991, Pub. L. No. 102–243
  (1991) ..............................................................................................................37

**Other Authorities**

11th Cir. R. 28–5 ....................................................................................................4

18 FCC Rcd. 14014 (2003) ....................................................................................35

30 FCC Rcd. 7961 (2015) ......................................................................................35

*Hounding*, MERRIAM-WEBSTER, https://www.merriam-
  webster.com/dictionary/hounding (last visited May 15, 2023) .........................19

J. BAKER, AN INTRODUCTION TO ENGLISH LEGAL HISTORY 474 (5th ed.
  2019) ...............................................................................................................15

RESTATEMENT (SECOND) OF TORTS § 158................................................................32

RESTATEMENT (SECOND) OF TORTS § 218................................................................33

RESTATEMENT (SECOND) OF TORTS § 222A..............................................................32

RESTATEMENT (SECOND) OF TORTS § 652B .....................................................*passim*

RESTATEMENT (SECOND) OF TORTS § 821B .......................................................28, 31

RESTATEMENT (SECOND) OF TORTS § 821D..............................................................32

U.S. Const. art. III, § 2 ....................................................................................13

## Jurisdictional Statement

The district court exercised federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs-Appellees Susan Drazen and Jason Bennett ("Plaintiffs-Appellees") asserted a claim arising under the Telephone Consumer Protection Act, 47 U.S.C. § 227, as set forth in Plaintiffs-Appellees' Complaint. *See* Doc. 1.[1]

The Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291, as the district court's December 23, 2020 order granting final approval of the class action settlement and dismissing the action with prejudice, *see* Doc. 74, is a "final decision."

In July 2022, a panel of this Court held "that the class definition does not meet Article III standing requirements," such that the Court did not "have subject-matter jurisdiction in this case." *Drazen v. Pinto*, 41 F.4th 1354, 1359 (11th Cir. 2022), *reh'g en banc granted and opinion vacated*, 61 F.4th 1297 (11th Cir. 2023). The Court subsequently granted Plaintiffs-Appellees' petition for rehearing *en banc* and vacated the panel's opinion. *Drazen v. Pinto*, 61 F.4th 1297, 1298 (11th Cir. 2023).

---

[1] Unless otherwise indicated, "Doc." references are to the corresponding Docket Entry Number in *Drazen v. GoDaddy.com, LLC*, Case No. 19–cv–00563 (S.D. Ala. filed Aug. 21, 2019).

## Statement of Issues

1. Whether the receipt of a single text message constitutes a concrete injury sufficient to confer Article III standing under the Telephone Consumer Protection Act.

## Statement of the Case

### A. The Underlying Litigation

This is an appeal of the district court's order granting final approval to a class action settlement that resolved three pending matters.

In the first case, Plaintiff-Appellee Susan Drazen ("Drazen") brought suit against Defendant-Appellee GoDaddy.com, LLC ("GoDaddy") in August 2019 in the United States District Court for the Southern District of Alabama (the "Southern District of Alabama"), alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. This action is styled *Drazen v. GoDaddy.com, LLC*, Case No. 19–cv–00563.

In the second case, Plaintiff-Appellee Jason Bennett ("Bennett") brought suit against GoDaddy in June 2016 in the Southern District of Alabama, alleging violations of the TCPA based on telephone calls. This action, styled *Bennett v. GoDaddy.com, LLC*, was transferred to the United States District Court for the District of Arizona (the "District of Arizona") in November 2016, and designated Case No. 2:16–cv–03908. In February 2020, this action was transferred to the Southern District of Alabama, and consolidated with *Drazen v. GoDaddy.com, LLC*, Case No. 19–cv–00563.

In the third case, John Herrick ("Herrick") brought suit against GoDaddy in January 2016 in the District of Arizona, alleging a violation of the TCPA based on

a single text message. This action is styled *Herrick v. GoDaddy.com, LLC*, Case No. 2:16–cv–00254, *appeal docketed*, No. 18–16048 (9th Cir. June 7, 2018). In May 2018, the District of Arizona granted GoDaddy's motion for summary judgment and dismissed the case in its entirety, holding that "undisputed material facts show that GoDaddy did not use an automatic telephone dialing system ('ATDS') to send the text in question." *Herrick v. GoDaddy.com, LLC*, 312 F. Supp. 3d 792, 793 (D. Ariz. 2018). Herrick appealed to the Ninth Circuit, and in December 2019, the Ninth Circuit granted the parties' joint motion to stay the appeal pending approval of the class action settlement in *Drazen*.

Plaintiffs-Appellees and Herrick (collectively, "Plaintiffs") each brought their respective suits as purported class actions.[2]

## B.     The Settlement

In January 2020, Plaintiffs filed an unopposed motion for preliminary approval of a class action settlement. Doc. 20. The settlement class was initially

---

[2] Objector-Appellant's Statement of the Case includes inaccurate claims regarding the background of this matter, including, but not limited to: (1) Objector-Appellant claimed that "1.2 million Plaintiffs [brought] a TCPA class action against GoDaddy," Objector-Appellant's Br. at 14, but only three named plaintiffs brought such claims; and (2) Objector-Appellant claimed that "GoDaddy initiated a massive marketing campaign, using an automatic telephone dialing system," Objector-Appellant's Br. at 14, but GoDaddy disputes all of the allegations and claims in these matters, as set forth in the settlement agreement at issue, the Second Amended Class Action Settlement Agreement (the "Agreement"), *see* Doc. 45–1, which also explicitly confirms that the Agreement was "without any admission of liability." *Id.* at ¶¶ 5, 9–10, 80–81.

defined to include "all persons within the United States who received a call or text message to his or her cellular telephone from [GoDaddy] during the Class Period," subject to certain exclusions not relevant to this appeal. Doc. 20–1 at ¶ 46. The Agreement calls for GoDaddy to "make a total of up to thirty-five million U.S. Dollars ($35,000,000.00) (the 'Total Settlement Amount') available for settlement of Approved Claims and Settlement Costs." Doc. 45–1 at ¶ 50. As the district court observed, as part of the settlement "Class Members received the choice between a $150 Voucher or a $35 cash award," *see* Doc. 74, and the Voucher Award is freely transferrable, good on all products and services GoDaddy offers, and does not require any minimum purchase. *See* Doc. 45–1 at ¶ 51(b).

C.     **The District Court's Examination Of Standing And Preliminary Approval Of The Settlement**

On February 21, 2020, the district court issued a *sua sponte* order "examin[ing] its own jurisdiction," in light of this Court's holding in *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019), "that an individual's receipt of a single text message was 'not a basis for invoking the jurisdiction of the federal courts' because the plaintiff's allegations did 'not state a concrete harm that meets the injury-in-fact requirement of Article III.'" Doc. 30 at 2 (quoting *Salcedo*, 936 F.3d at 1172).[3] The district court requested briefing from the Parties regarding (a) whether the proposed

---

[3] Unless otherwise indicated, the page number in record citations is the page number in the header generated by the electronic filing system. *See* 11th Cir. R. 28–5.

settlement class included text message only recipients, and (b) if so, the basis on which standing exists for these individuals in light of *Salcedo*. Doc. 30 at 3. The Parties subsequently redefined the settlement class as follows, subject to certain exclusions not relevant to this appeal:

> All persons within the United States to whom, from November 4, 2014 through December 31, 2016, Defendant placed a voice or text message call to their cellular telephone pursuant to an outbound campaign facilitated by the web-based software application used by 3Seventy, Inc., or the software programs and platforms that comprise the Cisco Unified Communications Manager.

Doc. 41 at ¶ 9. Additionally, GoDaddy was able to determine that approximately seven percent of the settlement class (approximately 91,000 individuals out of the approximately 1.26 million individuals comprising the settlement class) received only a single text message from GoDaddy.[4] Doc. 44 at 9.

After considering the Parties' briefs, the district court "determined that only the named plaintiffs must have standing," relying on this Court's decision in *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019). *See* Doc. 44 at 8–9. Therefore, Herrick could not be a class representative, as he received only a single text message. Doc. 44 at 8–9, 17. Although the roughly 91,000 settlement class members who also received only a single text message "would not have a viable

---

[4] Objector-Appellant incorrectly implied that these individuals received multiple "texts." *See* Objector-Appellant's Br. at 14. There is only one text message at issue, as Objector-Appellant subsequently acknowledged. *See id.* at 16 (noting these individuals "only received a single text").

claim in the Eleventh Circuit," some of those individuals would have a viable claim in a different Circuit based on the applicable law in that Circuit. Doc. 44 at 10. Therefore, the district court held that "GoDaddy is entitled to settle those claims in this class action although this Court would find them meritless had they been brought individually in the Eleventh Circuit." Doc. 44 at 10. The district court indicated it would preliminarily approve the class settlement so long as the Parties amended the class settlement agreement to remove Herrick as a Class Representative, Doc. 44 at 17, which the Parties did in the Agreement. Doc. 45–1.

### D. The Fee Award And Objector-Appellant's Objection

On August 11, 2020, the district court granted in part Plaintiffs-Appellees' motion for attorneys' fees, and awarded Plaintiffs-Appellees' counsel $8,750,000, or 25% of the Total Settlement Amount (counsel had requested $10,500,000, or 30% of the Total Settlement Amount). Doc. 51. On August 31, 2020, Objector-Appellant filed the only timely objection to the class settlement,[5] focusing primarily on (1) the fact that the district court resolved Plaintiffs-Appellees' counsel's fee request before the objection deadline, and (2) the amount of the fee award. *See* Doc. 53. Objector-Appellant also claimed that the parties' settlement was a "coupon settlement" subject to heightened scrutiny under the Class Action Fairness Act

---

[5] One other individual filed an untimely objection, Doc. 70, and the District Court struck it on that basis. Doc. 71.

("CAFA"), even though settlement class members had the option to receive either a Cash Award or a Voucher Award, and the Voucher Award is freely transferable, good on all products and services GoDaddy offers, and does not require any minimum purchase. Doc. 62 at 3–4. Objector-Appellant did not raise any colorable issue regarding the fairness, reasonableness, or adequacy of the class settlement. *See* Doc. 53; Doc. 65.

On September 1, 2020, the district court resolved Objector-Appellant's concern regarding the timing of the decision on the fee request by amending its prior order on fees "to correct and clarify that any assessment of attorneys' fees and costs were preliminary and subject to final review at the final approval hearing." Doc. 55.

### E. The District Court's Final Approval Of The Settlement

On December 23, 2020, the district court overruled Objector-Appellant's objections, and granted final approval of the class settlement as "fair, reasonable, and not the result of collusion." *See* Doc. 74 at 22. The district court also amended its preliminary fee award, and "approve[d] attorneys' fees totaling 20% of the [Total Settlement Amount], $7,000,000." *See id.* at 27.

### F. Objector-Appellant's Appeal Of The Final Approval Order

Objector-Appellant appealed the district court's final approval order. Objector-Appellant's appeal was directed primarily to the fees the district court awarded to counsel for Plaintiffs-Appellees (GoDaddy takes no position on that

7

dispute). Objector-Appellant also argued, incorrectly, (1) that the final approval order was subject to *de novo* review, even though a district court's decision to grant final approval of a class action settlement is reviewed for abuse of discretion; (2) that the district court somehow erred in concluding that the class settlement was not a "coupon settlement" under CAFA, even though the district court correctly found that settlement class members could choose between a voucher or cash award, the vouchers are freely transferable and good on all products and services GoDaddy offers, and half the settlement class members who submitted a claim elected to receive a voucher; and (3) that a reversal of the fee award would somehow mandate vacating the final approval order, even though the district court's analysis satisfies CAFA, and the fee award does not impact the approval of the settlement.

The panel did not reach these issues, as on July 27, 2022, the panel vacated the final approval order due to "an Article III standing problem with the class," and remanded the case to the district court "for the opportunity to revise the class definition." *Drazen*, 41 F.4th at 1355. The panel noted that there are "two key takeaways" from the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021):

> 1) To satisfy the concrete injury requirement for standing, a plaintiff alleging a statutory violation must demonstrate that history and the judgment of Congress support a conclusion that there is Article III standing; 2) "Every class member must have Article III standing in order to recover individual damages."

*Drazen*, 41 F.4th at 1360 (quoting *TransUnion*, 141 S. Ct. at 2204–2205, 2208). "[U]nder *Salcedo*, we have said that a single unwanted text message is not sufficient to meet the concrete injury requirement for standing." *Id.* at 1362. The settlement class includes approximately 91,000 individuals who received a single text message only, and thus do not have standing under *Salcedo*. *Id.* at 1357 n.3. "So, the class definition cannot stand to the extent that it allows standing for individuals who received a single text message."[6] *Id.* at 1362. The panel vacated the final approval order and remanded the matter to the district court. *Id.* at 1363. Plaintiffs-Appellees filed a petition for rehearing *en banc*, and on March 13, 2023, the Court granted the petition and vacated the panel's opinion. *See Drazen*, 61 F.4th at 1298.

---

[6] The panel further noted that "[t]he more difficult question is whether individuals who have received a single cellphone call also have standing." *Id.* at 1362. However, since the panel had "not received briefing on" that issue, the panel determined the "best course [was] to vacate the class certification and settlement and remand in order to give the parties an opportunity to redefine the class with the benefit of *TransUnion* and its common-law analogue analysis." *Id.* at 1363. The Court did not direct the parties to address this issue in the *en banc* briefing.

## Summary of the Argument

Defendant-Appellee GoDaddy.com, LLC ("GoDaddy") submits this Appellee's *en banc* brief pursuant to the Court's March 15, 2023 Memorandum directing the parties to focus their *en banc* briefs on the following issue: "Does the receipt of a single unwanted text message constitute a concrete injury sufficient to confer Article III standing under the TCPA?"

In *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019), this Court correctly held that the receipt of a single text message did not constitute a concrete injury sufficient for Article III standing, and this *en banc* Court should re-affirm that result. To evaluate whether the alleged harm associated with a statutory violation is concrete for purposes of Article III standing, a plaintiff must show that it is sufficiently close to the harm historically addressed by a common-law tort. *See, e.g.*, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021); *Hunstein v. Preferred Collection & Mgmt. Servs.*, 48 F.4th 1236, 1242, 1244 (11th Cir. 2022) (en banc). A plaintiff has standing only if the alleged new harm is "close enough, element-wise" to the specific old harm. *Hunstein*, 48 F.4th at 1242, 1244. If a core element of a common-law tort is missing, the harm is not close enough to a historical analogue to be concrete.

The receipt of one text message is not a concrete injury for Article III standing because the alleged harm associated with one text message—mere annoyance—is not sufficiently close to the harm addressed by any common-law tort. First, there is

no analogy to intrusion upon seclusion. In the context of communications, the harm that tort addresses is that associated with "calls [that] are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff," *see Salcedo*, 936 F.3d at 1171 (quoting RESTATEMENT (SECOND) OF TORTS § 652B, cmt. d), and one text cannot amount to harassment or hounding. Moreover, the cases that Plaintiffs-Appellees and Objector-Appellant cited as part of a purported circuit split (i) pre-date *TransUnion* and, in many instances, failed to engage in the historical analysis required by *TransUnion* (and by this Court's *en banc* decision in *Hunstein*), (ii) dealt with phone calls or multiple text messages, rather than a single text message, or (iii) erred in applying the historical harm-to-harm comparison.

Second, there is no analogy to public nuisance because a single text message does not implicate a public right. Even if there were a public right at issue, one text message does not interfere with that right.

Third, no other common-law tort is sufficiently close to the alleged harm associated with a single text message. Any analogy to trespass and private nuisance would fail because one text message does not involve any interference with land. There is no analogy to conversion because one text message does not involve an exercise of complete and permanent dominion over the receiving device. There is no analogy to trespass to chattels because one text message does not involve dispossession of chattels or deprivation of use. Therefore, there is no historical

common-law tort analogue for the harm allegedly associated with a single text message, meaning there is no concrete injury associated with a single text message, and no standing.

Moreover, there is no Congressional history to support overturning this Court's holding in *Salcedo* that one text message is not a concrete injury sufficient for Article III standing, because Congress made no legislative findings concerning the alleged harm caused by a single text message. Given that (1) there is no historical analogue to the alleged harm associated with a single text message, and (2) there are no Congressional findings to suggest that there is a concrete harm associated with one text message, the Court in *Salcedo* correctly held that the receipt of one text message was not a sufficient injury for Article III standing.

Additionally, the doctrine of *stare decisis* supports preserving *Salcedo*, because it is a clear rule that has engendered reliance in this Circuit. This Court has re-affirmed the holding in *Salcedo* multiple times, *Salcedo*'s well-reasoned analysis is consistent with the Court's other decisions on standing, and numerous cases in this Circuit have been resolved pursuant to *Salcedo*. For all these reasons, as set forth more fully herein, this *en banc* Court should re-affirm the holding in *Salcedo* that the receipt of one text message is not a concrete injury sufficient for Article III standing.

**Argument**

### A.    Legal Standard

Article III of the United States Constitution defines the role of the federal judiciary as resolving "Cases" and "Controversies."  U.S. CONST. art. III, § 2; *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016).  Standing to sue is a "core component" of the Article III case or controversy requirement.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  The doctrine of standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Spokeo*, 578 U.S. at 338 (citations omitted).  Standing "must exist 'throughout all stages of litigation.'"  *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013)).  This Court "review[s] Article III standing de novo."  *Hunstein v. Preferred Collection & Mgmt. Servs.*, 48 F.4th 1236, 1241 (11th Cir. 2022) (en banc) (citing *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 923 (11th Cir. 2020) (en banc)).

To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan*, 504 U.S. at 560–561).  "The question in this case focuses on" the first element—specifically, "the Article III requirement that the plaintiff's injury in fact

13

be 'concrete'—that is, 'real, and not abstract.'" *Id.* at 2204 (quoting *Spokeo*, 578 U.S. at 340).

**B.  One Text Message Is Not A Concrete Injury**

To determine whether a harm is concrete, courts consider "whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* The focus is on the harm itself—not the action that led to the harm. This Court has summarized the Supreme Court's instruction as follows: "see if a new harm is similar to an old harm." *Hunstein*, 48 F.4th at 1242, 1244 (quoting *Muransky*, 979 F.3d at 931) (further describing the appropriate inquiry as a "harm-to-harm comparison").

*TransUnion* illustrates how courts should apply this harm-to-harm comparison. The *TransUnion* plaintiffs asserted a statutory cause of action under the Fair Credit Reporting Act based on misleading information in their consumer credit files, but the files for one group were shared with third-party businesses, while a second group's files were not. *TransUnion*, 141 S. Ct. at 2208–2209. The Supreme Court held that only the first group had standing, based on an analogy to the tort of defamation. *See id.* Although misleading information is sufficiently close to false information to constitute an analogous kind of harm, a publication is a core part of the injury that the tort of defamation aims to prevent, such that only the class members that alleged a dissemination to third parties had standing. *See id.* "Since

the basis of [defamation] was the loss of credit or fame, and not the insult, it was always necessary to show a publication of the words." *Id.* at 2209 (quoting J. BAKER, AN INTRODUCTION TO ENGLISH LEGAL HISTORY 474 (5th ed. 2019)). While an unpublished, misleading statement can "insult" or annoy, the tort of defamation was never intended to redress that type of harm. *See id.* In other words, the harm from an unpublished, misleading statement is different in kind from the harm associated with defamation, not merely different in degree.

To make this harm-to-harm comparison, the court must first identify the old harm, as the Court in *TransUnion* did when it identified the harm associated with defamation as "hatred, contempt, or ridicule" rather than "insult." *See id.* at 2208–2209. Thus, there are two steps to assess whether a statutory violation is sufficiently analogous to a "traditionally recognized" cause of action. *Hunstein*, 48 F.4th at 1242. First, identify (a) the old harm that the traditional cause of action targeted, and (b) the plaintiff's alleged new harm. Second, evaluate whether the alleged new harm is "close enough, element-wise" to the specific old harm. *Id.* at 1242, 1244.

This Court is well-versed in this two-step approach, having applied it in two recent *en banc* decisions—*Hunstein* and *Muransky*. The plaintiff in *Hunstein* alleged that a creditor violated the Fair Debt Collection Practices Act ("FDCPA") when it sent information about his debt to a mail vendor, who then sent the plaintiff

a letter about the debt. 48 F.4th at 1240. To assess the plaintiff's standing, this Court considered whether a "communication by the defendant to a third person" is "close enough" to the publicity element of the tort of public disclosure. *Id.* at 1244–1246. The Court explained that "the harm at the core of the tort is based not on the fact that embarrassing information exists, but that the public knows about it." *Id.* at 1245. As a result, a private disclosure to one entity is not sufficiently similar to a public disclosure to many—a difference in the kind of harm, not just in the degree of harm—because true "[p]ublicity causes a qualitatively different harm, one that is essential to creating the comparator tort in the first place." *Id.* at 1249. Although the underlying conduct—a disclosure—was similar, the harms attributable to private and public disclosures are qualitatively different. It is only through a clear, preliminary identification of the "old harm"—as this Court did in *Hunstein*—that the Court can then compare it to the alleged new harm.

This Court engaged in the same two-step analysis in *Muransky*, in which the plaintiff claimed a retailer violated the Fair and Accurate Credit Transactions Act ("FACTA") by printing too many digits of consumers' credit card numbers on purchase receipts. 979 F.3d at 921–922. The plaintiff's standing turned on whether this alleged harm was close enough to the common-law tort of breach of confidence. *Id.* at 931–932. That tort requires a disclosure to a third party of nonpublic information learned in a confidential relationship. *Id.* at 932. The act of "[h]anding

a common form of payment to a cashier at a retail store is simply not equivalent" to a disclosure that would harm such a "vulnerable, confidential relationship." *Id.* There was no disclosure, and no harm to a "close professional relationship"—the harm redressed by the underlying tort. *Id.* Therefore, the analogy failed, and there was no injury in fact.

This same reasoning applies to this case and necessarily leads to the conclusion that a single text message does not cause the same kind of harm redressed by any relevant common-law tort.

### 1. One Text Is Not Analogous To Intrusion Upon Seclusion

#### a. One Text Is Not Persistent Conduct That Amounts To Hounding, The Harm That An Intrusion Upon Seclusion Claim Targets

In *Salcedo v. Hanna*, the Court correctly applied this Circuit's two-step approach to determine that a single text message does not cause the kind of harm redressed by the common-law tort of intrusion upon seclusion. 936 F.3d 1162, 1171 (11th Cir. 2019). The Court first identified the old harm redressed by the tort of intrusion upon seclusion. This tort "creates liability for invasions of privacy that would be 'highly offensive to a reasonable person.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 652B). In the context of communications like telephone calls, the harm this tort addresses is that associated with "calls [that] are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 652B, cmt. d); *see also Gadelhak v.*

17

*AT&T Services, Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (noting the tort addresses the emotional harm that stems from "a course of hounding the plaintiff") (also quoting the Restatement); *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017) (also quoting the Restatement).

The Court in *Salcedo* correctly identified that mere annoyance and inconvenience—the only potential type of harm associated with a single text message—are ***not*** traditionally redressable harms. *Salcedo*, 936 F.3d at 1171–1172. "Salcedo's allegations of a brief, inconsequential annoyance are categorically distinct from those kinds of real but intangible harms" traditionally redressable through tort law. *Id.* at 1172; *see Hunstein*, 48 F.4th at 1254 (Pryor, C.J., concurring) ("Taking personal offense has long been insufficient to constitute a legal injury.").

The Restatement supports the Court's reasoning in *Salcedo*. *See* RESTATEMENT (SECOND) OF TORTS § 652B, cmt. d, illus. 8 ("A, a landlord, calls upon B, his tenant, at nine o'clock on Sunday morning, to demand payment of the rent, although he knows that B is not ready to pay it and that B objects to such a visit on Sunday. B is seriously annoyed. This is not an invasion of B's privacy."). As the Restatement makes clear, in the context of communications, the relevant harm is the mental distress and "substantial burden" to one's existence that stems from "a course of hounding." *Id.* at § 652B, cmt. d. The "course of hounding" is an essential

element of the tort of intrusion upon seclusion in this context, because without it, the alleged harm is not the same kind of harm that the common law sought to redress.

This Court has cautioned against "overthinking what was really a simple instruction: see if a new harm is similar to an old harm." *Muransky*, 979 F.3d at 931. The *Salcedo* panel followed this simple instruction. A "brief, inconsequential annoyance" is not like a burden to one's existence as a result of hounding. *Salcedo*, 936 F.3d at 1172. Therefore, a single text message is not similar enough to each element of intrusion upon seclusion to burden one's existence as a result of hounding. *See id.* at 1171 ("We do not see this type of objectively intense interference where the alleged harm is isolated, momentary, and ephemeral."). Thus, there is no concrete harm. "No concrete harm, no standing." *TransUnion*, 141 S. Ct. at 2200.

The Court in *Salcedo* recognized that the appropriate inquiry is "qualitative, not quantitative," consistent with other Circuit Courts. 936 F.3d at 1172–1173. Applying that framework, the Court in *Salcedo* correctly found that a single text message is qualitatively different from a course of hounding. *Id.* The dictionary definition of "hounding" is "to drive or affect by persistent harassing." *Hounding*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/hounding (last visited May 15, 2023). Persistence is not just a matter of the degree of harm caused by communications; it is the entire harm. By definition, a single text message cannot

form a pattern of persistent harassment—the very harm that the tort of intrusion upon seclusion was designed to address in the context of communications. Therefore, a single text message cannot constitute a burden to one's existence, substantial or not. *See* RESTATEMENT (SECOND) OF TORTS § 652B, cmt. d. The old harm is completely absent in this factual context.

To avoid any doubt, this Court does not need to address the issue of whether some additional number of texts could rise to the level of hounding. The only question on this *en banc* appeal (because there is only one text message at issue in this case) is whether the harm associated with a single text message is the same type of harm that the tort of intrusion upon seclusion was intended to address. The answer is no. Intrusion upon seclusion was intended to target the burden to one's existence caused by hounding, and one text message cannot constitute hounding. That alone is dispositive.

### b. The Decisions That Are Part Of The Purported Circuit Split Are Inapposite Or Include Errors In The Required Historical Analysis

Objector-Appellant and Plaintiffs-Appellees incorrectly suggest that *Salcedo*'s holding that one text message is not a concrete injury sufficient to confer Article III standing is at odds with decisions issued by other Circuit Courts. *See* Plaintiffs-Appellees' Pet. at 10, 14–20; Objector-Appellant's Br. at 23–24, 28–30. Rather, the cases cited in Objector-Appellant's Brief and Plaintiffs-Appellees'

petition for rehearing en banc—which precede *TransUnion*—are distinguishable, or reflect errors in the historical analysis that *Spokeo* and *TransUnion* require.

In *Susinno*, the Third Circuit addressed whether a single **phone call** constitutes a concrete injury sufficient for Article III standing through analogy to the tort of intrusion upon seclusion.[7] 862 F.3d at 351–352. This Court has not addressed that issue, but the panel found it was a "difficult question" whether individuals who received a single call had standing. *Drazen*, 41 F.4th at 1362. In any event, that issue is not before the Court on this *en banc* appeal.

Regardless, decisions from other Circuits concerning phone calls are not analogous to this appeal, which concerns a single text message. Unlike a phone call or a fax message, a text does not occupy the recipient device for any amount of time, or prevent the owner from receiving other calls or texts, or from using the phone for any other purpose. *See Salcedo*, 936 F.3d at 1170 (distinguishing faxes from text messages on this same basis); *Grigorian v. FCA US LLC*, 838 F. App'x 390, 393 (11th Cir. 2020) (same); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1270 (11th

---

[7] The Sixth and Tenth Circuits have also addressed whether a phone call is a concrete injury for Article III standing under the FDCPA. *Ward v. NPAS, Inc.*, 63 F.4th 576, 580–582 (6th Cir. 2023); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191–1192 (10th Cir. 2021). Objector-Appellant did not cite *Ward* or *Lupia* in its *en banc* Brief, and Plaintiffs-Appellees did not cite *Lupia* in their petition for rehearing *en banc* (*Ward* had not yet been issued), presumably in acknowledgement of the fact that these cases are readily distinguishable on a number of grounds, including (1) they deal with an entirely different statute, (2) they concern phone calls, not a single text message, and (3) they do not contain the required element-by-element historical analysis.

Cir. 2019) (same).  Text messages are "instantaneous[ly]" received, and more than one text message can arrive at once.  *See Salcedo*, 936 F.3d at 1170.  The Third Circuit has not addressed whether a single text message results in the same kind of harm as that redressed by the tort of intrusion upon seclusion.  Indeed, the Third Circuit has noted that it "decline[s] to adopt . . . an absolute rule of standing with respect to the TCPA" and that plaintiffs "must allege one of those injuries that the TCPA is intended to prevent," such as "nuisance, invasion of privacy, and other such injuries."  *Leyse v. Bank of Am. Nat'l Ass'n*, 856 F. App'x 408, 410–411 (3d Cir. 2021).  This reasoning suggests that the question of whether a single text message constitutes a concrete injury remains open in the Third Circuit.

Next, the Second, Third, and Ninth Circuit decisions that Objector-Appellant and Plaintiffs-Appellees cited[8] were issued before *TransUnion*, in which the Supreme Court applied the approach that this Court articulated in *Muransky*. *Compare TransUnion*, 141 S. Ct. at 2208–2210 (considering whether the new harm bore sufficient similarities to each element of a traditional common-law tort as to be of the same kind as the old harm that the common-law tort sought to redress), *with Muransky*, 979 F.3d at 932 (same).  Indeed, this Court noted in *Hunstein* that "[t]he Supreme Court . . . ratified our approach" in *TransUnion*.  *Hunstein*, 48 F.4th at

---

[8] *See, e.g.*, Plaintiffs-Appellees' Pet. at 14-20 (first citing *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017); then citing *Sussino*, 862 F.3d 346; and then citing *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85 (2d Cir. 2019)).

1239.  *Melito* and *Van Patten* do not contain an analysis of the elements of intrusion upon seclusion (or other common-law torts).  Rather, as this Court noted in *Salcedo*, the Ninth Circuit's historical analysis in *Van Patten* was a single sentence:  "Actions to remedy defendants' invasions of privacy, intrusion upon seclusion, and nuisance have long been heard by American courts, and the right of privacy is recognized by most states."  *Van Patten*, 847 F.3d at 1043; *see Salcedo*, 936 F.3d at 1172; *see also Melito*, 923 F.3d at 93 (no analysis of the elements of intrusion upon seclusion).  The Third Circuit did reference the elements of intrusion upon seclusion, but it deviated from *Hunstein*, *Muransky*, and *TransUnion* when it held that the new harm was comparable to the old harm even though an essential element of the comparator tort was missing.  *Susinno*, 862 F.3d at 351–352 (quoting RESTATEMENT (SECOND) OF TORTS § 652B, cmt. d) (finding sufficient similarity based on only one element of intrusion upon seclusion, the invasion of privacy and disturbance of solitude, while summarily discarding all other elements, including the requirement that the intrusion be "highly offensive to the ordinary reasonable [person]").  To the extent that *Melito*, *Susinno*, and *Van Patten* are inconsistent with *TransUnion*, *TransUnion* controls.[9]

---

[9] The Second and Third Circuits have not addressed whether *Melito* and *Susinno* remain good law in their respective Circuits post-*TransUnion*.  The Ninth Circuit reaffirmed *Van Patten*, but without considering the elements of any common-law tort.  *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1117–1118 (9th Cir. 2022).  This approach is inconsistent with this Court's element-by-element comparison set forth in *Muransky* and *Hunstein*, and "ratified" in *TransUnion*.  *See Hunstein*, 48 F.4th at 1239 ("The Supreme Court has since ratified our approach.").

The Seventh and Ninth Circuits addressed whether *multiple* text messages constitute a concrete injury through analogy to the traditional tort of intrusion upon seclusion. *Gadelhak*, 950 F.3d at 461–463; *Van Patten*, 847 F.3d at 1043. As correctly noted in *Salcedo*, this Court's "responsibility to ensure that plaintiffs allege a real injury in fact requires [the Court] to look closely at their allegations . . . ." 936 F.3d at 1173. This case concerns a single text message, not multiple text messages.

In dicta, the Seventh Circuit held that "the number of texts is irrelevant to the injury-in-fact analysis." *Gadelhak*, 950 F.3d at 463 n. 2. However, the Seventh Circuit did not apply the correct test, because it compared conduct rather than harms. The Seventh Circuit correctly identified that the harm redressed by intrusion upon seclusion, as it applies to communications, is "a course of hounding." *Id.* at 462 (quoting RESTATEMENT (SECOND) OF TORTS § 652B, cmt. d). However, in comparing the new harm to the old harm, the Seventh Circuit discarded this finding and instead focused on the text messages themselves—the general type of conduct, not the harm redressed by the common-law tort. *Id.* at 463 ("A few unwanted automated text messages may be too minor an annoyance to be actionable at common law. But such texts nevertheless pose the same *kind* of harm that common law courts recognize . . . ."). This Court, sitting *en banc*, recently rejected such a conduct-focused approach. *See Hunstein*, 48 F.4th at 1249. Where the same type of conduct (in *Hunstein*, a disclosure) "causes a qualitatively different harm, one that

24

is essential to creating the comparator tort in the first place," then the new harm is not of the same kind as the old harm.  *Id.*  The Seventh Circuit's comparison of conduct to conduct rather than harm to harm is inconsistent with this Court's approach in *Hunstein* and the Supreme Court's approach in *TransUnion*.  It is also inconsistent with the Seventh Circuit's own articulation of the law.  *See Gadelhak*, 950 F.3d at 462 (holding that the appropriate inquiry is a comparison of the harms).

Moreover, the Seventh Circuit's focus on conduct would lead to absurd results.  Many actions, done repeatedly until they rise to the level of harassment or hounding, might theoretically give rise to liability under some common-law tort.  For example, no one would suggest that there was any harm associated with receiving a single letter in the mail.  However, if one were to receive a thousand letters in a short period of time, one could see how that might theoretically give rise to an allegation of hounding.  The Seventh Circuit's analysis does not distinguish between those examples, because in their conduct-to-conduct comparison, it is just a quantitative difference.  Such an approach would enable Congress to "create[e] new injuries out of whole cloth."  *Hunstein*, 48 F.4th at 1243.  Under the correct harm-to-harm comparison, it is clear that the harm redressed by intrusion upon seclusion is the harm that stems from a benign action repeated to the point of harassment or

hounding.  *See* Restatement (Second) of Torts § 652B, cmt. d.  The repetition *is* the harm in this context.[10, 11]

Objector-Appellant and Plaintiffs-Appellees thus overstated the purported circuit split on the issue before this *en banc* Court.  The decisions Plaintiffs-Appellees and Objector-Appellant cited pre-date *TransUnion*, and many of them either do not concern text messages (*Sussino*), or do not squarely raise the

---

[10] A conduct-to-conduct comparison is also likely to yield inconsistent results.  For instance, in *Gunn v. Thrasher, Buschmann & Voelkel, P.C.*, 982 F.3d 1069, 1071 (7th Cir. 2020), the Seventh Circuit held that a law firm's letter in violation of the FDCPA is not a concrete injury because, while text messages are analogous to "noises and other aggravating intrusions" that are redressable at common law, aggravating letters are dissimilar.  However, given that any "course of hounding" that poses a "substantial burden on [one's] existence" can constitute intrusion upon seclusion, it is doubtful that the common law would distinguish between sending someone one thousand letters and calling them one thousand times.  *See* Restatement (Second) of Torts § 652B, cmt. d.  At least one judge has commented on this potential for inconsistency, stating that he "ha[s] not yet been able to extract from these different lines of cases a consistently predictable rule or standard."  *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1250 (7th Cir. 2021) (Hamilton, C.J., concurring).

[11] The Sixth Circuit in *Ward* erred in a similar fashion, in addition to other distinguishing factors, including that *Ward* concerned a phone call (not a text message), and a different statute (the FDCPA).  The Sixth Circuit erroneously regarded "annoyance" as the kind of harm that the tort of intrusion upon seclusion was designed to redress. *Ward*, 63 F.4th at 581 (quoting *Gadelhak*, 950 F.3d at 463). The Restatement squarely contradicts this finding, as this Court correctly recognized in *Salcedo*.  936 F.3d at 1171–1172; *see* Restatement (Second) of Torts § 652B, cmt. d, illus. 8.  Indeed, even the Seventh Circuit agrees that "annoyance" is not the kind of harm that confers Article III standing.  *See, e.g., Gunn*, 982 F.3d at 1071 (explicitly distinguishing between "annoyance" and "injury" in the context of unwanted communications, and stating that mere annoyance does not fall within the rule of *Gadelhak*).

issue before this Court as to whether one text message is a concrete injury sufficient for Article III standing. The one decision that is arguably at odds with *Salcedo* with respect to the outcomes (*Gadelhak*) agrees with this Court on the appropriate framework for the required historical analysis, but GoDaddy respectfully submits that the Seventh Circuit erred in conducting that analysis. In *Gadelhak*, the Seventh Circuit deviated from the approach set forth in *TransUnion* and *Hunstein* by focusing on the conduct at issue, rather than comparing the historical harm to the alleged new harm.

These out-of-circuit decisions offer no basis for this Court to abandon *Hunstein* and *Muransky*, especially given that the Supreme Court "ratified" this Court's approach in *TransUnion*. *Hunstein*, 48 F.4th at 1239, 1244 ("*TransUnion* endorsed the same theory that we articulated in *Muransky* . . . ."). Rather, this Court should continue to focus on the kind of harm that the common law sought to prevent, as *TransUnion* instructs. In the context of communications, the common-law tort of intrusion upon seclusion sought to protect only against injuries that posed a "substantial burden to [one's] existence" from a "course of hounding." RESTATEMENT (SECOND) OF TORTS § 652B, cmt. d. A single text poses no burden to one's existence and cannot constitute hounding. Therefore, a single text message is not sufficiently analogous to the common-law tort of intrusion upon seclusion to constitute an injury in fact.

### 2. One Text Is Not Analogous To Public Nuisance

A single text message also does not cause the same kind of harm that the common-law tort of public nuisance was designed to prevent. "A public nuisance is an unreasonable interference with a right common to the general public." RESTATEMENT (SECOND) OF TORTS § 821B(1). A core element of public nuisance is interference with a "public right." *Id.* at § 821B(1) & cmt. g. "A public right is one common to all members of the general public. It is collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured." *Id.* at § 821B, cmt. g.

The nature of the right—public and collective, as opposed to private and individual—is core to the harm that the tort seeks to prevent. The tort seeks to protect only the "interests of the community at large," not the interest of specific individuals, even if large in number. *Id.* at § 821B, cmts. b, g. A pair of Missouri cases illustrates this distinction. In *Smith v. Sedalia*, 53 S.W. 907, 911 (Mo. 1899), the Missouri Supreme Court held that pollution of a river cannot constitute a public nuisance if it only affects the rights of a large number of landowners downstream. Though many people would be negatively affected by such an act, "that does not convert the injurious act into a public nuisance, for it is only those individuals and not the public in general who suffer." *Id.* On the other hand, roughly twenty years later, the Missouri Court of Appeals had no difficulty in holding that pollution of a

river does constitute a public nuisance when it kills fish in the river, thus affecting all members of the public who wish to fish in the river. *State ex rel. Wear v. Springfield Gas & Elec. Co.*, 204 S.W. 942, 945–46 (Mo. Ct. App. 1918).

The crucial distinction between these two cases is whether a public right was implicated. As another court explained, "[a] public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals." *Dean v. State*, 106 S.E. 792, 793 (Ga. 1921) (citation omitted); *see also Finkelsetin v. City of Sapulpa*, 234 P. 187, 188 (Okla. 1925) (quoting *Calkins v. Ponca City*, 214 P. 188, 192 (Okla. 1923)) ("A 'public nuisance' is not necessarily one affecting the government or the entire community of the state, but it is public if it affects the surrounding community generally or the people of some local neighborhood."). A public right is an essential element of public nuisance, such that when it is absent, the kind of harm sought to be prevented by the common-law tort is also absent. As such, if this essential element is missing, there is no injury in fact. *See Hunstein*, 48 F.4th at 1245.

Applying these principles, a single text message does not implicate a public right. A text message affects only its recipient—it is inherently private. It does not indiscriminately subject a member of the public to any harm simply by virtue of that individual attempting to exercise a public right, such as walking along a public road or fishing in a public stream. A single text message is not sufficiently close to the

harm addressed by the common-law tort of public nuisance to establish an injury in fact because an essential element of the tort—a public right—is absent.

The Fifth Circuit reached a contrary conclusion in *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 692 (5th Cir. 2021), but only through a flawed analogy between a text message and a condition that impairs a public right to access a road. "Cranor wants to use our Nation's telecommunications infrastructure without harassment. In that sense, he's similar to someone who wants to use another piece of infrastructure like a road or bridge without confronting a malarial pond, obnoxious noises, or disgusting odors." *Id.* (citation omitted).

Even assuming that telecommunications infrastructure is like a road, the Fifth Circuit's analogy fails because a single text message is not like a condition that affects every member of the public that seeks to exercise the public right. When a malarial pond, an obnoxious noise, or a disgusting odor impacts a road, it affects *every* member of the public who attempts to travel across the road, thus interfering with the public right to use the highway. A text message, however, only reaches its recipient. The rest of the general public—and even the recipient, for that matter—can continue to use the telecommunications infrastructure without any impairment. Objector-Appellant and Plaintiffs-Appellees cite nothing in the record that supports any inference that a single text message obstructs the telecommunications infrastructure, or impedes communication by all who use that

infrastructure, akin to blocking a road.  Even if there were a public right to use the telecommunications infrastructure, a single text message does not implicate that supposed right.[12]

The Fifth Circuit's analysis is inconsistent with this Court's well-reasoned analysis in *Hunstein*.  When a plaintiff attempts to analogize a statutory violation to a common-law tort to establish Article III standing, each essential element of the tort must be present.  *See Hunstein*, 48 F.4th at 1245.  If an essential element is missing, there is no concrete injury, and thus no standing.  *See id.*  Without interference with a public right, the new "harm" of a single text message is not like the old harm to the "interests of the community at large."  *See* RESTATEMENT (SECOND) OF TORTS § 821B, cmts. b, g.  Therefore, a single, unwanted text message is not sufficiently analogous to the common-law tort of public nuisance to constitute an injury in fact.

### 3.    One Text Is Not Analogous To Other Common-Law Torts

No Circuit Court has held that a single text message is analogous to any other common-law tort.  In an abundance of caution, however, GoDaddy submits that all such analogies would fail.  A single text message lacks "an element 'essential to liability'" for trespass, private nuisance, conversion, and trespass to chattel.  *See Hunstein*, 48 F.4th at 1242 (quoting *TransUnion*, 141 S. Ct. at 2209).

---

[12] In other words, to the extent that such a public right exists, the essential element of interference with that public right is missing in this case. *See* RESTATEMENT (SECOND) OF TORTS § 821B.

The *Salcedo* panel correctly noted that trespass and private nuisance are inextricably linked to interference with land. 936 F.3d at 1171. "Trespass requires intentionally 'enter[ing] land in the possession of the other . . . .'" *Id.* (first alteration in original) (quoting RESTATEMENT (SECOND) OF TORTS § 158(a)). Indeed, interference with real property rights is so core to the tort of trespass that the section of the Restatement dealing with trespass is titled "Liability for Intentional Intrusions on Land." RESTATEMENT (SECOND) OF TORTS § 158(a). Meanwhile, "private nuisance similarly requires 'a nontrespassory invasion of another's interest in the private use and enjoyment of land,'" *Salcedo*, 936 F.3d at 1171 (quoting RESTATEMENT (SECOND) OF TORTS § 821D), and is only intended to "protect[] . . . interests in the use and enjoyment of land." RESTATEMENT (SECOND) OF TORTS § 821D. A text message has no connection to land or real property, so these essential elements are missing entirely.

A single text message is also unlike the common-law tort of conversion. Conversion requires the "exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." RESTATEMENT (SECOND) OF TORTS § 222A. Conversion is intended to redress the harm of "serious, major, and important interferences," such that the interference was equivalent to completely depriving the true owner of the use of the chattel. *Id.* at § 222A, cmt. c. As the

*Salcedo* panel correctly noted, a single text message is "nowhere near a complete and permanent dominion over [a] phone." 936 F.3d at 1171. Again, an essential element of the comparator tort is missing.

Similarly, any analogy to trespass to chattels would fail. Liability for trespass to chattels requires (1) dispossession of the chattel, (2) a "depriv[ation] of the use of the chattel for a substantial time," (3) bodily harm to the possessor, or (4) harm to the chattel's "physical condition, quality, or value." RESTATEMENT (SECOND) OF TORTS § 218 & cmt. e. In other words, an essential element of trespass to chattels is the presence of at least one of these factors. But, a single text message is "the kind of fleeting infraction upon personal property" that lacks any iota of these requirements. *Salcedo*, 936 F.3d at 1172.

Each of these common-law torts is unlike a single text message because an essential element of the comparator tort is missing. Therefore, they are not sufficiently similar to a single text message to constitute an injury in fact. *Hunstein*, 48 F.4th at 1242.

### 4. Congressional History Does Not Support Overturning *Salcedo*

"Congress's views may be 'instructive,'" but not determinative, in evaluating "whether a harm is sufficiently concrete to qualify as an injury in fact." *TransUnion*, 141 S. Ct. at 2204 (quoting *Spokeo*, 578 U.S. at 341). "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of

their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III . . . ." *Id.* at 2205; *see also Muransky*, 979 F.3d at 926. Indeed, Objector-Appellant readily concedes, as he must, that "Congress cannot transform a non-injury into an injury on its say-so." Objector-Appellant's Br. at 18 (first citing *TransUnion*, 141 S. Ct. at 2205; and then citing *Spokeo*, 578 U.S. at 341).

Rather, the role of Congressional judgment is a limited one. "Congress is well positioned to identify intangible harms that meet minimum Article III requirements . . . ." *Spokeo*, 578 U.S. at 341. Through legislative fact-finding, Congress can "define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before," but only because such fact-finding can aid the judiciary in determining that the identified injury is concrete. *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 580 (1992) (Kennedy, J., concurring in part and concurring in the judgment)). In other words, Congress can shine a light on the manner in which an injury is concrete, but it cannot ***make*** an injury concrete. And, as the Supreme Court succinctly explained, "[n]o concrete harm, no standing," even when a statutory cause of action exists. *TransUnion*, 141 S. Ct. at 2200.

Objector-Appellant's arguments regarding the FCC's interpretation of the TCPA are misplaced. Objector-Appellant argues that the FCC's position on the

meaning of the TCPA is entitled to deference under *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). As an initial matter, *Chevron* deference is not applicable here, as it is limited to "a challenge to an agency construction of a statutory provision." *Chevron*, 467 U.S. at 866. Article III standing is a constitutional matter, not a matter of statutory construction. *See, e.g.*, *Spokeo*, 578 U.S. at 339.

Moreover, this appeal does not concern the meaning of the TCPA. Rather, it concerns whether a single text message is a concrete harm sufficient for Article III standing. On this topic, the FCC is silent. *See* 18 FCC Rcd. 14014, 14155 (2003) (stating only that text messages are "calls" within the meaning of the TCPA without any discussion of whether a single text message is harmful); *see also* 30 FCC Rcd. 7961, 8017 (2015) (characterizing the FCC's prior position on text messages as merely determining that "the TCPA applies to SMS texts," again without discussion of whether a single text message is harmful). There is no reason for this Court to consider whether *Chevron* deference applies in the context of Article III standing because the FCC offered no opinion on whether a single text message is a concrete harm. The FCC was answering a different question.

Instead, this Court should look to what Congress has said about the harm caused by a single text message—nothing. *Salcedo*, 936 F.3d at 1168–1169 (footnote omitted) (noting that Congress said nothing "in the TCPA's provisions and findings about harms from telemarketing via text message generally"). The TCPA's

only reference to text messages is in a section prohibiting misleading or inaccurate caller ID information, and that was added as part of a 2018 amendment more than twenty-five years after Congress enacted the TCPA. Consolidated Appropriations Act, 2018, Pub L. No. 115–141, div. P, § 503(a), 132 Stat. 348, 1091–92 (2018) (codified at 47 U.S.C. § 227(e)); *see also Salcedo*, 936 F.3d at 1169 n. 7. Congress did not engage in legislative fact-finding that might be "instructive" to this Court in analyzing whether a single text message is a concrete harm. *See Spokeo*, 578 U.S. at 341.

Such silence ends the inquiry. If Congress is to elevate a harm to recognition as an injury in fact, Congress must show its work. It is only by "defin[ing] injuries and articulat[ing] chains of causation" that Congress can aid the judiciary in assessing whether a harm is sufficiently concrete to constitute an injury in fact. *Id.* (quoting *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring in part and concurring in the judgment)). As this Court correctly held in *Salcedo*, "congressional silence is a poor basis for extending federal jurisdiction to new types of harm." 936 F.3d at 1169. Such silence does nothing to "instruct[]" the judiciary on the manner in which some new type of harm is concrete. *Spokeo*, 578 U.S. at 341.

In any event, a number of Congress's factual findings regarding the harms caused by unsolicited phone calls are plainly inapplicable to a single text message, as the *Salcedo* panel recognized. Congress expressed concern with the "proliferation

of intrusive, nuisance calls to [consumers'] homes," but cell phones are often used outside the home and are often silenced. Telephone Consumer Protection Act of 1991, Pub. L. No. 102–243, § 2, ¶ 6 (1991); *see Salcedo*, 936 F.3d at 1169. Further, Congress found that "residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." Pub. L. No. 102–243, § 2, ¶ 10. Congress made no similar legislative finding regarding text messages.

Additionally, Congress found that "the Federal Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy." *Id.* at § 2, ¶ 13 (emphasis added); *see also Salcedo*, 936 F.3d at 1169. This statement indicates that, as in *Muransky*, "Congress expressly recognized . . . that not all violations of [the TCPA] pose a serious threat to consumers." 979 F.3d at 933. This finding cautions against assuming that Congress's reasons for adopting the TCPA are a perfect fit to all conduct theoretically within the scope of the statute, especially when Congress made no findings specific to text messages.

This Court is ultimately tasked with independently evaluating whether a single text message constitutes a concrete injury. *See Hunstein*, 48 F.4th at 1243 ("[T]he Constitution forbids the view that 'once Congress has spoken, the courts have no further role.'") (quoting *Muransky*, 979 F.3d at 933). The judgment of

37

Congress can be instructive, but it is not in this case. Congress judged that some (but not all) unsolicited phone calls cause harm based on rationales that do not apply to a single text message. And Congress' silence as to text messages is telling. Such silence holds no persuasive value and cannot alter the conclusion that a single text message does not constitute a concrete harm sufficient for Article III standing.

### C.     *Salcedo* **Is Established Law In This Circuit**

This Court should preserve its holding in *Salcedo* that the receipt of a single text message is not a concrete injury sufficient for Article III standing not only because that is the correct decision under the Constitution and *TransUnion*, but also because it is an important, clear rule that has engendered reliance in this Circuit. Under the rule of *stare decisis,* "courts should not lightly overrule past decisions." *McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) (quoting *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 403 (1970)). Preserving precedential decisions "is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). "It also reduces incentives for challenging settled precedents, saving parties and the courts the expense of endless relitigation." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 455 (2015).

*Salcedo* has been the law in this Circuit since 2019, and numerous cases have been resolved under *Salcedo*'s well-reasoned analysis. *See, e.g.*, *Grigorian*, 838 F. App'x at 393–394 (affirming the dismissal of a TCPA case based on *Salcedo* because the plaintiff failed to plead that a single voicemail "rendered her phone unavailable to receive legitimate calls or messages for any period of time"); *Cordoba*, 942 F.3d at 1270 (favorably discussing *Salcedo*); *Weitz v. Genting New World LLC*, No. 22–cv–23209, 2023 WL 2328365, at *3 (S.D. Fla. Mar. 2, 2023) ("[A] claim seeking relief for [a Florida Telephone Solicitation Act ("FTSA")] violation based solely on the receipt of a single, unwanted text message is nonjusticiable."); *Muccio v. Global Motivation, Inc.*, No. 22–81004–CIV, 2022 WL 17969922, at *3 (S.D. Fla. Dec. 27, 2022) (dismissing TCPA and FTSA claims based on receipt of five text messages due to plaintiff's failure to allege a concrete injury), *appeal docketed*, No. 23–10081 (9th Cir. Jan. 9, 2023); *Fontanez v. Wolverine World Wide, Inc.*, No. 22–cv–2538, 2022 WL 17959844, at *2–3 (M.D. Fla. Dec. 27, 2022) (remanding FTSA claim based on receipt of multiple text message for lack of standing because plaintiff's "failure to allege any concrete injury means this Court lacks jurisdiction") (collecting cases); *Fenwick v. Orthopedic Specialty Inst., PLLC*, No. 19–CV–62290, 2020 WL 913321, at *3–4 (S.D. Fla. Feb. 4, 2020) (recommending dismissal of TCPA claim based on receipt of two text messages for lack of standing). This Court should re-affirm the holding in *Salcedo*

that one text message is not a concrete injury sufficient for Article III standing under the TCPA.

Plaintiffs-Appellees and Objector-Appellant incorrectly suggest that *Salcedo* is somehow inconsistent with other Eleventh Circuit precedent. *See* Plaintiffs-Appellees' Pet. at 21–23; Objector-Appellant's Br. at 24 n. 45, 26 n. 46. First, Plaintiffs-Appellees and Objector-Appellant mischaracterized *Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301 (11th Cir. 2020), in suggesting that the plaintiffs in *Glasser* had standing even though "each received just one call." *See* Plaintiffs-Appellees' Pet. at 22; Objector-Appellant's Br. at 24 n. 45. The plaintiffs in *Glasser* received thirteen and thirty-five calls, respectively, 948 F.3d at 1305, and the Court found that it was bound to follow the holding in *Cordoba* that "[t]he receipt of more than one unwanted telemarketing call . . . is a concrete injury" for purposes of Article III standing. *Glasser*, 948 F.3d at 1306 (quoting *Cordoba*, 942 F.3d at 1270). This appeal concerns the receipt of one text message, not more than a dozen calls. In any event, the panel in this case noted that *Glasser* may "need to [be] reexamine[d]" as it was "decided pre-*TransUnion*" and "conducted no historical analysis and is suspect on that ground alone." *Drazen*, 41 F.4th at 1363 n. 14.

Second, Plaintiffs-Appellees and Objector-Appellant erroneously suggest that *Salcedo* is somehow inconsistent with this Court's pre-*TransUnion* decisions finding that the receipt of a fax message could be a concrete injury sufficient for Article III

standing. *See* Plaintiffs-Appellees' Pet. at 21–22 (first citing *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245 (11th Cir. 2015); and then citing *Florence Endocrine Clinic, PLLC v. Arriva Med., LLC*, 858 F.3d 1362 (11th Cir. 2017)); Objector-Appellant's Br. at 26 n. 46 (same). This Court has consistently and repeatedly rejected this argument, and distinguished fax messages from text messages because "[a] fax message consumes the receiving device entirely, while a text message consumes the receiving device not at all. A cell phone user can continue to use all of the device's functions, including receiving other messages, while it is receiving a text message." *Salcedo*, 936 F.3d at 1167–1168; *accord Grigorian*, 838 F. App'x at 393–394 (same); *Cordoba*, 942 F.3d at 1270 (same). This Court has consistently applied and endorsed *Salcedo*, and this Court should reject the effort by Plaintiffs-Appellees and Objector-Appellant to overturn it.

## Conclusion

This Court correctly held in *Salcedo* that the receipt of one text message is not a concrete harm sufficient to confer Article III standing under the TCPA. This *en banc* Court should re-affirm that conclusion, and hold that the receipt of one text message is not a concrete injury sufficient to confer Article III standing under the TCPA.

Dated: May 15, 2023        Respectfully Submitted,

**COZEN O'CONNOR**

*s/ Jeffrey M. Monhait*

Matthew B. Criscuolo, Florida No. 58441
One North Clematis Street, Suite 510
West Palm Beach, FL 33401
Tel: 561-515-5263
Fax: 561-515-5230
Email: mcriscuolo@cozen.com

Jeffrey M. Monhait
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel: 215-665-2084
Fax: 215-989-4183
Email: jmonhait@cozen.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

By: *s/ Jeffrey M. Monhait*
Jeffrey M. Monhait

<u>**CERTIFICATE OF COMPLIANCE**</u>

I hereby certify that, pursuant to FRAP 32(g)(1) and 11th Cir. R. 32–4 regarding type volume limitations, according to the word processor program used to create the foregoing, this *En Banc* Brief of Defendant-Appellee GoDaddy.com, LLC contains 12054 words.